T.C. Memo. 1996-383


UNITED STATES TAX COURT


BENJAMIN AND SALLIE CAMPFIELD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 804-93.                    Filed August 19, 1996.


<u>Andrew B. Bowman</u>, for petitioners.

<u>Carmino J. Santaniello, Jr.</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION

CLAPP, <u>Judge</u>:  Respondent determined deficiencies in, and
additions to, petitioners' Federal income taxes as follows:

| Year | Deficiency | Additions to tax | | | | |
|------|-----------|------------------|---|---|---|---|
| | | Sec. 6653(b)(1)* | Sec. 6653(b)(2)* | Sec. 6653(b)(1)(A)* | Sec. 6653(b)(1)(B)* | Sec. 6661 |
| 1984 | $43,179.86 | $21,589.93 | 50% of the interest due on $43,179.86 | -- | -- | $10,794.97 |
| 1985 | 25,106.76 | 12,553.38 | 50% of the interest due on $25,106.76 | -- | -- | 6,276.69 |
| 1986 | 13,685.74 | -- | -- | $12,207.56 | 50% of the interest on $13,685.74 | 3,421.44 |

* Additions to tax for fraud apply only to Benjamin Campfield.

By amendment to answer, respondent asserted the following increase in the deficiency and additions to tax:

| Year | Deficiency | Additions to tax | | |
|------|-----------|------------------|---|---|
| | | Sec. 6653(b)(1)* | Sec. 6653(b)(2)* | Sec. 6661 |
| 1985 | $7,393.24 | $3,696.62 | 50% of the interest due on $7,393.24 | $1,848.31 |

* Additions to tax for fraud apply only to Benjamin Campfield.

After concessions by the parties, the issues for decision are:

(1)  Whether petitioners received unreported income of $105,205.26 in 1984, $70,214.39 in 1985, and $31,204.29 in 1986. We hold that they did.

(2)  Whether petitioner Benjamin Campfield is liable for additions to tax for fraud under section 6653(b) for the years in issue.  We hold that he is liable.

(3) Whether the assessments for 1984, 1985, and 1986 are barred by the statute of limitations. We hold that the assessments are not barred.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

                         FINDINGS OF FACT

Some of the facts are stipulated and are so found. We incorporate by reference the stipulation of facts and attached exhibits.

Benjamin and Sallie Campfield (petitioners) are husband and wife, and they resided in Trumbull, Connecticut, at the time they filed their petition. Benjamin Campfield (petitioner) was born in Sylvania, Georgia. His education did not proceed beyond the seventh grade.

Arturo's, Inc.

From 1969 through 1988, petitioner was the sole shareholder of Arturo's, Inc. (Arturo's), which operated a cafe and bar under the name "Club 1127" in Bridgeport, Connecticut. Arturo's was predominantly a cash business during the years 1984 through 1986. Arturo's filed U.S. Corporation Income Tax Returns (Forms 1120) for the fiscal years ended May 31, 1982, through 1986.

B & K Variety

From 1977 through 1992, petitioner operated a convenience store called B&K Variety located in New Haven, Connecticut. Petitioner operated B&K Variety as a sole proprietorship. B&K Variety was primarily a cash business for which petitioner maintained a separate bank account. Petitioners reported income and expenses for B&K Variety on Schedules C of their Federal income tax returns for the taxable years 1984, 1985, and 1986.

Route 3 Property

Around October 18, 1984, petitioner agreed to purchase approximately 67 acres of land, together with improvements and various items of personal property, located on Route 3 in Sylvania, Georgia (Route 3 property), for a purchase price of $148,000. Petitioner deposited $5,000 in cash with John Robinson of Robinson Real Estate to be applied to the purchase price.

Petitioner purchased a cashier's check at Connecticut National Bank in Bridgeport, Connecticut, on November 28, 1984, with $143,000 in cash. The sale of the Route 3 property closed on December 3, 1984. At the closing, petitioner applied the $143,000 cashier's check to the purchase price.

Route 21 Property

Around November 7, 1984, petitioner agreed to purchase approximately 347 acres of land located on Route 21 in Sylvania, Georgia (Route 21 property), for $150,000. On or about November

20, 1984, Leroy Campfield, petitioner's brother, gave Wilkes Williams (Williams), also with Robinson Real Estate, $5,000 in cash to be applied to the purchase price of the Route 21 property. Along with the $5,000 in cash, Leroy Campfield delivered to Williams a purchase contract signed by petitioner.

The sale of the Route 21 property closed on or about January 18, 1985. At the closing, petitioner produced a $50,000 cashier's check, No. 14430953, dated January 9, 1985, and a briefcase containing $47,000 in cash to be applied to the purchase price. The entire $47,000 in cash consisted of $20 bills. Williams helped count the $47,000, and, because only $45,000 was needed to close the sale, $2,000 was returned to petitioner.

Petitioner financed $50,000 of the Route 21 property purchase with a 90-day note given to the sellers, payable on April 15, 1985. Petitioner satisfied the note in 1985 with a $52,417.12 trustee check drawn on the client account of attorney James M. Kearns (Kearns). Kearns assisted petitioners with their real estate activities, among other things.

After the closing on the Route 21 property, Williams deposited the $45,000 in cash, along with cashier's check No. 14430953, at a local bank. An employee of the bank informed Williams that, because the deposit involved over $10,000 in cash, the bank would notify the Internal Revenue Service (IRS) about

the deposit. When Williams conveyed this information to petitioner, petitioner said that it did not matter whether the bank notified the IRS.

Campfield Farm

We will refer to the Route 3 property and the Route 21 property collectively as the Campfield farm. The Schedules F attached to the petitioners' 1985 and 1986 Federal income tax returns listed "Livestock Sales" as the principal product of the Campfield farm. Petitioner also sold melons in 1985 and 1986, but the record does not indicate whether the melons were grown on the Campfield farm.

Several pieces of farm equipment were purchased for use on the Campfield farm. Leroy Campfield purchased the following equipment from a farm equipment dealer in Sylvania, Georgia:

| Equipment | Price | Date of Purchase |
|-----------|-------|------------------|
| A.C. Harrow | $1,800 | Jan. 10, 1985 |
| Planter | 1,400 | Mar. 5, 1985 |
| Combine | 6,500 | Aug. 5, 1985 |

The harrow, planter, and combine were each purchased from the same farm equipment dealer, and the dealer prepared a separate invoice for each purchase. Each of the three invoices shows "Campfield Farm" as the purchaser. Leroy Campfield purchased the harrow, planter, and combine on petitioner's behalf.

Insurance Settlement

On August 10, 1965, petitioner acquired residential rental real property.  Fire destroyed the property in 1977.  Petitioner demolished the damaged structure and removed it from the property.  In September 1978, petitioner received a net insurance settlement in the amount of $66,000.  Petitioners remain the owners of the land without improvements.

Loans and Bank Accounts

In May 1979, petitioner borrowed $17,000 at 12 percent annual interest.  The term of this loan was 5 years.

On March 31, 1982, petitioners obtained a home improvement loan from Connecticut National Bank (CNB loan) in the principal amount of $19,590.  The term of the CNB loan was 60 months at 18 percent annual interest.

Petitioner obtained other loans and credit that respondent took into account in the net worth computations.  These amounts are not in dispute.

Petitioner maintained an interest-bearing money market account with Connecticut National Bank from 1983 through 1986. During several months in 1983 and 1984, the balance in this account exceeded $40,000.  Petitioners maintained other checking accounts, but none of these accounts is in dispute.

On December 9, 1984, Leroy Campfield opened account No. 030-1471-9 located in the Bank of Screven County (account No.

030-1471-9), which had a balance of zero on December 31, 1983, $7,200.51 on December 31, 1984, $41.36 on December 31, 1985, and $1,037.56 on December 31, 1986. The signature card for account No. 030-1471-9 shows "Campfield Farms Leroy Campfield" as the name of account. The only signature on the signature card is that of Leroy Campfield. The signature card and the bank statements show the same Sylvania, Georgia, mailing address.

Other Assets

Petitioners owned other assets, including real estate and automobiles. The ownership of these other assets is not in dispute.

Petitioners did not receive inheritances, gifts, or insurance settlements during the years 1983 through 1986.

Cash Transactions and Third-Party Checks

Petitioner entered into the following cash transactions during the years in issue:

### 1984

| | |
|---|---|
| 1984 Mercedes (deposit) | $2,720.00 |
| 1984 Mercedes | 22,635.02 |
| Route 3 property (deposit) | 5,000.00 |
| Cashier's check (Route 3 property) | 143,000.00 |
| Route 21 property (deposit) | 5,000.00 |
| Automobile insurance | 8,067.00 |
| | 186,422.02 |

## 1985

| | |
|---|---:|
| Casino chips | $13,100.00 |
| Tractor trailer | 2,000.00 |
| Automobile repairs | 969.21 |
| Automobile insurance | 859.00 |
| Route 21 property | 45,000.00 |
| | 61,928.21 |

## 1986

| | |
|---|---:|
| Casino chips | $10,700.00 |
| Automobile repairs | 11,149.32 |
| Chevy pickup (deposit) | 500.00 |
| 1981 BMW (deposit) | 500.00 |
| | 22,849.32 |

Petitioner paid $493.98 toward an auto body repair bill using third-party checks. He also cashed third-party checks at a grocery store in Bridgeport, Connecticut.

Gambling Activities

Petitioner gambled at Tropworld in Atlantic City, New Jersey, in 1985 and 1986. Petitioner purchased casino chips on May 19, 1985, in the amount of $13,100 and on November 29, 1986, in the amount of $10,700. Tropworld filed a Currency Transaction Report by Casinos, Form 8362 (CTR), with the IRS for each of these purchases.

Tropworld maintained a List Accounts Detail Ratings (List Account) which showed that petitioner purchased casino chips on

May 19, 1985, in the amount of $13,100 and on November 29, 1986, in the amount of $10,700.

Income Tax Returns

Petitioners' accountant, David Nyden (Nyden), prepared petitioners' U.S. Individual Income Tax Returns (Forms 1040) from 1978 through the years in issue.

Each month Nyden would go to B&K Variety, Arturo's, or petitioners' home to pick up monthly financial records for B&K Variety. The records included bank statements, check stubs, bills, and day sheets. A day sheet reflected the gross cash receipts and cash payouts for a particular date. Petitioner summarized the cash transactions on the day sheet and then gave the day sheet to Nyden.

Nyden would reconcile the day sheets with bank deposits into the B&K Variety bank account. Nyden used the monthly bank statements and the day sheets to calculate the gross receipts for B&K Variety that he reported on petitioners' Schedules C for 1984, 1985, and 1986. Petitioner used a cash register at B&K Variety from 1984 through 1986, but Nyden did not use the cash register tapes to prepare petitioners' returns.

Petitioner provided Nyden with receipts related to the farming activity conducted on the Campfield farm. At the end of the year, Nyden and petitioner would discuss the farm activities, and petitioner would give Nyden receipts for income and expenses.

On petitioners' Form 1040 for the taxable year 1984, petitioners reported other income of $124,000. Nyden wrote "COMMISSIONS" next to the entry of $124,000. On petitioners' Form 1040 for the taxable year 1985, petitioners reported other income of $50,000. Nyden wrote "COMMISSIONS" next to the entry of $50,000.

Petitioners filed their 1984, 1985, and 1986 Federal income tax returns on October 15, 1985, October 16, 1986, and September 10, 1987, respectively. Respondent issued a statutory notice of deficiency dated October 16, 1992, for petitioners' taxable years 1984, 1985, and 1986.

Nyden also prepared the Forms 1120 for Arturo's during the years in issue. Nyden would go to Arturo's or to petitioners' home and pick up bank statements, canceled checks, check stubs, and the day sheets for Arturo's. Nyden used this information to complete the Forms 1120.

Respondent's Investigation

Respondent began a criminal investigation of petitioner sometime prior to 1991. Special Agent Edward J. Burke (Agent Burke) with the IRS criminal investigation division investigated petitioner for the taxable years 1984, 1985, and 1986.

Agent Burke interviewed petitioner, and Kearns represented petitioner during the interview. During that interview, petitioner, on the advice of counsel, invoked his rights under

the Fifth Amendment to the Constitution and refused to answer some of Agent Burke's questions. For example, petitioner refused to answer whether he had cash on hand as of December 31, 1983. Petitioner also refused to answer questions about the source of the income reported as "commissions" on his 1984 and 1985 Forms 1040.

Agent Burke served summonses on Connecticut National Bank and the Bank of Screven County. These banks complied with the summonses, and Agent Burke used the records to prepare the net worth computations for the taxable years 1984 through 1986.

On June 1, 1992, petitioner waived his right to indictment and pled guilty to an information charging him with one count of willfully making and subscribing to a materially false Federal income tax return for the taxable year 1985 in violation of section 7206(1). On September 14, 1992, petitioner was sentenced to 3 years' incarceration, suspended after 6 months, placed on 5 years' probation, and fined $10,000.

## OPINION

The dispute in this case focuses on respondent's net worth computations and respondent's fraud determinations. Petitioners argue that respondent's net worth calculations are invalid due to errors. Petitioners also contend that respondent has failed to prove that petitioner is liable for the fraud additions to tax. Petitioners dispute only four of the items in respondent's net

worth computations.  Petitioners do not otherwise contest respondent's deficiency determinations or the additions to tax pursuant to section 6661.  We conclude that petitioners have conceded the uncontested items.  Money v. Commissioner, 89 T.C. 46, 48 (1987).

Net Worth Analysis

Respondent used the net worth plus expenditures method to determine that petitioners had unreported income in 1984, 1985, and 1986.  In a case such as this, where the determination of unreported income as well as the existence of fraud depends upon respondent's net worth computations, we must examine the validity of respondent's computations in light of the standards set forth in Holland v. United States, 348 U.S. 121 (1954), and United States v. Massei, 355 U.S. 595 (1958).  Under those standards, the Commissioner must establish, with reasonable certainty, an opening net worth as a starting point from which to calculate future increases in the taxpayer's assets.  Holland v. United States, supra at 132.  In addition to showing an opening net worth, the Commissioner must also show a likely source of the unreported income or negate possible sources of nontaxable income.  Id. at 132-138; United States v. Koskerides, 877 F.2d 1129, 1137 (2d Cir. 1989); Smith v. Commissioner, 91 T.C. 1049, 1059 (1988), affd. 926 F.2d 1470 (6th Cir. 1991).

Under the net worth method, income is computed by determining a taxpayer's net worth at the beginning and end of a period. The difference between the amounts is the increase in net worth. An increase in a taxpayer's net worth, plus his nondeductible expenditures, less nontaxable receipts, may be considered taxable income. Holland v. United States, supra at 125.

Where the Commissioner has determined a deficiency by using the net worth method, we may adjust a determination of opening net worth shown by the trial record to be unrealistic. Hoffman v. Commissioner, 298 F.2d 784, 786 (3d Cir. 1962), affg. in part T.C. Memo. 1960-160; Baumgardner v. Commissioner, 251 F.2d 311 (9th Cir. 1957), affg. T.C. Memo. 1956-112; Potson v. Commissioner, 22 T.C. 912, 928-929 (1954), affd. sub nom. Bodoglau v. Commissioner, 230 F.2d 336 (7th Cir. 1956). Any such adjustments do not invalidate the presumption of correctness attaching to other aspects of the Commissioner's deficiency determination if the determination was not arbitrary. Hoffman v. Commissioner, supra at 788.

Respondent calculated petitioners' net worth for the years in dispute, and we have attached the summary of respondent's calculations as an appendix. The parties agree on all but four categories of respondent's net worth calculations. We address below only those categories in dispute.

The disputed categories include petitioners' opening cash on hand, the ownership of funds in the Bank of Screven County, the acquisition of a planter in 1985 for use on the Campfield farm, and petitioner's purchase of casino chips on May 19, 1985, and November 29, 1986.

Cash on Hand

Petitioners argue that respondent incorrectly determined cash on hand in the amount of $6,163.95 as of January 1, 1984. Petitioner contends that he had a cash hoard of $143,000 in a safe-deposit box located at Connecticut National Bank.

Petitioner contends that the $143,000 cash hoard consisted of the $66,000 insurance settlement received in 1978 plus accumulated savings. According to petitioner, he purchased the cashier's check applied to the Route 3 property using the $143,000 in cash. For the reasons discussed below, we find that petitioner did not maintain a cash hoard of $143,000.

On March 31, 1982, petitioner obtained the CNB loan in the amount of $19,590. Petitioner's borrowing of funds during the time that he allegedly had a cash hoard supports the inference that no cash hoard existed. See O'Connor v. Commissioner, 412 F.2d 304, 311 (2d Cir. 1969), affg. in part and revg. and remanding in part T.C. Memo. 1967-174; Thomas v. Commissioner, 223 F.2d 83, 88 (6th Cir. 1955), revg. and remanding a Memorandum Opinion of this Court dated Oct. 30, 1953.

Petitioner maintained an interest-bearing money market account during the years 1984 through 1986. In 1984 and 1985, petitioner placed substantial sums of money in this account. These transactions indicate that petitioner was not mistrustful of banks, and we find it unlikely and improbable that petitioner would forgo interest on the $143,000 allegedly kept in the safe-deposit box. See Conti v. Commissioner, T.C. Memo. 1992-616, affd. in part and revd. and remanded in part 39 F.3d 658 (6th Cir. 1994).

Petitioner waited until trial to assert that he had a cash hoard, and he made no such claim to respondent's agents. Petitioner's delay in claiming the existence of a cash hoard is a factor that weighs in respondent's favor. See United States v. Gay, 567 F.2d 1206, 1207 (2d Cir. 1978).

Petitioners reported adjusted gross income of $26,197 and $13,206 for the taxable years 1982 and 1983, respectively. We find it unlikely that petitioners could have accumulated a significant cash hoard from this income.

We find that petitioner did not maintain a cash hoard in the safe-deposit box at Connecticut National Bank as of January 1, 1984.

### Funds in the Bank of Screven County

Respondent's net worth and expenditures computations included cash in banks. Respondent determined that petitioner

owned the funds in account No. 030-1471-9 located in the Bank of Screven County, which had a balance of zero on December 31, 1983, $7,200.51 on December 31, 1984, $41.36 on December 31, 1985, and $1,037.56 on December 31, 1986. Petitioner contends that his brother, Leroy Campfield, owned account No. 030-1471-9.

On December 9, 1984, Leroy Campfield opened account No. 030-1471-9. The signature card for account No. 030-1471-9 shows "Campfield Farms Leroy Campfield" as the name of account. The only signature on the signature card is that of Leroy Campfield. The signature card and the bank statements show the same Sylvania, Georgia, mailing address.

Leroy Campfield acted on petitioner's behalf when petitioner purchased the Route 21 property. Leroy Campfield gave Williams $5,000 on petitioner's behalf and a purchase contract signed by petitioner. Leroy Campfield purchased equipment and supplies on petitioner's behalf. The invoices associated with said purchases show Campfield farm as the purchaser. We find that Leroy Campfield opened account No. 030-1471-9 on petitioner's behalf and that petitioner owned the funds in account No. 030-1471-9.

Planter

Respondent determined that petitioners acquired a planter for $1,400 on March 5, 1985. Petitioner stipulated that in 1985 he acquired a combine and a harrow for use on the Campfield farm. Leroy Campfield purchased the combine and the harrow on

petitioner's behalf.  Leroy Campfield also purchased a planter, but petitioner denies ownership of the planter.

The combine, harrow, and planter were each purchased from the same dealer.  The invoices associated with the purchase of the combine and harrow show Campfield farm as the purchaser.  The invoice associated with the planter shows Campfield farm as the purchaser.  Leroy Campfield was acting on petitioner's behalf at Campfield farm, and it seems highly unlikely that he would buy a planter for something other than farm purposes, particularly when the planter fits logically into the farm activities.  We find that petitioner owned the planter.

Purchase of Casino Chips

Respondent determined that petitioner purchased casino chips on May 19, 1985, in the amount of $13,100, and on November 29, 1986, in the amount of $10,700.  Respondent considered these amounts nondeductible personal expenses.

Tropworld filed at least two CTR's that relate to petitioner.  The first CTR indicates that petitioner purchased $13,100 of casino chips on May 19, 1985.  The second CTR indicates that petitioner purchased $10,700 of casino chips on November 29, 1986.  The List Account maintained by Tropworld shows that on May 19, 1985, petitioner purchased casino chips in the amounts of $9,000, $2,000, $500, and $1,600, which corresponds with the $13,100 shown on the CTR for that date.  The

List Account for November 29, 1986, reveals that petitioner purchased casino chips in the amounts of $1,000, $1,700, $2,100, $800, $300, $1,800 and $3,000, which corresponds with the $10,700 shown on the CTR for that date. Thus, the dollar figures on the List Account for May 19, 1985, and November 29, 1986, corroborate the dollar figures shown on the CTR's filed by Tropworld.

Petitioner does not dispute the evidence presented by respondent concerning the purchase of the casino chips on May 19, 1985, and November 29, 1986. Petitioners argues that respondent had a duty to obtain records from Tropworld that would reveal petitioner's gambling winnings during 1982 and 1983 and that, by failing to do so, respondent's opening cash on hand figure is fatally flawed. This argument is without merit. Respondent need only establish, with reasonable certainty, petitioners' net worth as of January 1, 1984. Any gambling winnings from 1982 and 1983 will be taken into account in the net worth calculations. Petitioners reported no gambling winnings on any tax returns filed for the years 1982 through 1986.

We find that petitioner incurred nondeductible expenditures of $13,100 on May 19, 1985, and $10,700 on November 29, 1986, for the purchase of casino chips at Tropworld.

We conclude that respondent's net worth computations meet the first prong of the test in Holland v. United States, 348 U.S.

121 (1954); i.e., that the opening net worth be established with reasonable certainty.

We now turn to the alternative branch of the second prong of the Holland test, pursuant to which respondent must show a likely source of the unreported income or negate possible sources of nontaxable income.

Whether or not respondent has shown a likely source of petitioners' unreported taxable income, proof of a likely source of income is not a prerequisite to use of the net worth method when possible sources of nontaxable income are negated. United States v. Massei, 355 U.S. 595 (1958); United States v. Mastropieri, 685 F.2d 776, 785 (2d Cir. 1982). Petitioner, himself, denied receipt of any gifts, inheritances, or insurance settlements during the years in issue. Respondent investigated petitioners' banking activities and found no evidence of nontaxable income.

Respondent must also establish that a reasonable investigation of leads to possible sources of nontaxable income has been conducted. Holland v. United States, supra at 135-138; United States v. Mastropieri, supra at 785. We have rejected petitioner's cash hoard claim. Petitioners made no other claims of nontaxable sources of income. Once respondent has explored the leads available to her and established a prima facie case, she has met this burden. Petitioner "remains quiet at his

peril." United States v. Mastropieri, supra at 785 (quoting Holland v. United States, supra at 139). We conclude that respondent's agents conducted a reasonable investigation of leads to possible sources of nontaxable income.

We conclude that respondent's net worth computations meet the standards set forth in Holland v. United States, supra, and United States v. Massei, supra. We conclude that petitioners had unreported income of $105,205.26 in 1984, $70,214.39 in 1985, and $31,204.29 in 1986.

We now turn to respondent's fraud determinations.

Fraud

The Commissioner has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). First, the Commissioner must prove the existence of an underpayment. Parks v. Commissioner, 94 T.C. 654, 660 (1990). The Commissioner may not rely upon the taxpayer's failure to carry the burden of proof as to the underlying deficiency. Id. at 660-661; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). Second, the Commissioner must show that the taxpayer intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent tax collection. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Petitioner's conviction

under section 7206(1) does not collaterally estop him from denying that he fraudulently understated his tax liabilities; however, it is evidence to be considered by the trier of fact. Wright v. Commissioner, 84 T.C. 636 (1985).

Underpayment

When the allegations of fraud are intertwined with unreported income and reconstructed income as they are here, we must be careful not to bootstrap a finding of fraud upon a taxpayer's failure to prove the Commissioner's deficiency determination erroneous. Parks v. Commissioner, supra at 661. Respondent offered prima facie evidence of petitioners' net worth. For the reasons discussed above, we find that respondent's net worth computations established substantial amounts of unreported income and consequent underpayment of taxes for 1984, 1985, and 1986.

Fraudulent Intent

Respondent must prove by clear and convincing evidence that petitioner had fraudulent intent. Id. at 664. Fraud may be proven by circumstantial evidence. Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

Courts have developed various factors or "badges" that tend to establish fraud. Circumstantial evidence that may give rise to a finding of fraudulent intent includes: (1) Understatement

of income; (2) inadequate or no records; (3) concealment of assets; (4) implausible or inconsistent explanations of behavior; (5) failure to file tax returns; (6) failure to cooperate with tax authorities; (7) dealing in cash; (8) engaging in illegal activity; and (9) attempting to conceal an illegal activity. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Clayton v. Commissioner, 102 T.C. 632 (1994). These "badges" of fraud are nonexclusive. Miller v. Commissioner, 94 T.C. 316, 334 (1990). A taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). The intent to conceal or mislead may be inferred from a pattern of conduct. Spies v. United States, 317 U.S. 492, 499 (1943).

Understatement of income, by itself, does not establish fraud. However, a consistent pattern of understating income over a number of years is strong evidence of fraudulent intent to evade the income tax. Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-144 and T.C. Memo. 1970-37; Otsuki v. Commissioner, supra at 108. Petitioners reported income of $139,838 in 1984, $37,852 in 1985, and $21,217 in 1986. Petitioners underreported their income by $105,205.26 in 1984, $70,214.39 in 1985, and $31,204.29 in 1986.

Failure to maintain accurate records may be a badge of fraud. Merrit v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172. Petitioner failed to maintain any records as to the "commissions" he reported on his 1984 and 1985 Federal income tax returns.

Petitioner kept some records for his various businesses from which he gave figures to Nyden. These books were never audited. Petitioner prepared the day sheets for Arturo's and B&K Variety, and there were no safeguards to assure that all cash receipts found their way into the books. Nyden never reviewed cash register tapes. In short, petitioner pretty much could include the amount of cash that suited him. We find that petitioner's records were inadequate.

Nyden's preparation of petitioners' Forms 1040 did not redeem or correct the inadequacy of petitioner's records. Nyden would prepare petitioners' Forms 1040 using the information provided by petitioners. Nyden frequently noticed that "the expenses were just out of whack" with the revenue. Nyden would discuss the matter with petitioner to determine whether there was any more income. Thus prompted, petitioner would furnish Nyden with an additional income figure to plug the gap. Petitioner never referred to any documents or provided Nyden with any backup material related to the additional income. For example, Nyden summarized the income and expenses for the Campfield farm for one

of the years at issue. The expenses were "just so far out of line" with the revenue that Nyden asked petitioner if there was any additional income from the farm. Petitioner responded that there was $15,000 of additional income. Petitioner provided no explanation of the source of the $15,000 of additional income. We conclude that petitioner's records did not reflect accurately his income and expenses.

We have no evidence that petitioner attempted to conceal any particular assets. However, given respondent's net worth analysis and petitioner's various business activities, we find that petitioner concealed substantial amounts of cash that passed through his hands and never appeared in his records or Forms 1040.

We find petitioner's explanations of the circumstances surrounding the alleged cash hoard to be implausible and inconsistent. Petitioner made little attempt to explain his financial activities. To the extent he did so, we find those explanations vague and inadequate.

Petitioners filed tax returns for the years in issue, but the net worth analysis indicates substantial unreported income. Petitioner also pled guilty to criminal charges of willfully making and subscribing to a materially false Federal income tax return for the taxable year 1985.

False or misleading statements to the Commissioner's agents can be evidence of fraudulent intent. Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980). Petitioner refused to answer some of Agent Burke's questions, pleading the Fifth Amendment or on the advice of counsel. As for questions that petitioner did answer, we do not find petitioner's statements false or misleading.

A taxpayer's extensive use of cash can be an indication of fraudulent intent. Bradford v. Commissioner, supra at 308; McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). Petitioner made cash expenditures of $186,422.02, $61,928.21, and $22,849.32 for the years 1984, 1985, and 1986 respectively. Petitioner purchased items such as automobiles, real estate, and automobile insurance with cash when payment by check would have appeared more conventional. Petitioner offered no explanation why he used cash for such substantial expenditures.

Respondent has not shown that petitioner was engaged in, or attempted to conceal, an illegal activity during the taxable years 1984 through 1986.

Respondent contends that petitioner's cashing of third-party checks is evidence of fraudulent intent. See Corrigan v. Commissioner, T.C. Memo. 1994-31. Petitioner paid $493.98 toward an auto body repair bill using third-party checks. Petitioner

also cashed third-party checks at a grocery store in Bridgeport, Connecticut, during the taxable years 1984 through 1986. There is no explanation or accounting by petitioner for this unorthodox use of third-party checks.

Courts have also considered the educational level and sophistication of the taxpayer. Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). Petitioner argues that because his education did not proceed beyond the seventh grade, and because he is "cognitively limited" with a verbal IQ of 82 and a performance IQ of 76, he is incapable of committing fraud. The scope and extent of his business activities, which included a farm, rental real estate, a cafe and bar, and a convenience store, and his apparent financial success belie that argument. See, e.g., Estate of Temple v. Commissioner, 67 T.C. 143, 162 (1976), in which we found fraud, noting that the taxpayer's "limited formal education did not prevent him from realizing substantial amounts of income".

Considering the record taken as a whole and reasonable inferences therefrom, we conclude that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes, and that the entire underpayments are attributable to fraud.

Statute of Limitations

The Commissioner generally is required to assess tax within 3 years of the date the return is filed.  Sec. 6501(a).  There is no limitation period to assess tax if the Commissioner proves fraud.  Sec. 6501(c)(1).

In light of our holding that respondent has proved fraud under section 6653(b) for petitioner, we hold that assessment and collection of the deficiencies and additions to tax for substantial understatement determined against petitioners, and of the additions to tax for fraud determined against petitioner, are not barred by the statute of limitations.  Accordingly, we need not reach respondent's alternative argument under section 6501(e) for 1985.

To reflect the foregoing and the concessions by the parties,

Decision will be entered

under Rule 155.

```
                              APPENDIX

                    Summary - Net Worth Computation
                              1984 - 1986

Item Particulars         12/31/83      12/31/84     12/31/85      12/31/86

 1. Cash on hand        $6,163.95     $2,280.48    $1,770.34       $500.00
 2. Cash in banks       12,067.79     52,551.48     7,982.37     15,767.15
 3. Real estate        317,016.36    477,515.36   584,906.01    584,906.01
 4. Motor vehicles      70,300.00    102,516.50    86,509.50     86,509.50
 5. Business equipment  28,689.91     28,689.91    28,689.91     28,689.91
 6. Farm equipment          --            --       14,925.40     18,425.40
 7. Inventory           23,493.00     13,115.00    10,826.00      9,885.00
 8. Common stock,
       Arturo's         14,000.00     14,000.00    14,000.00     14,000.00
 9. Loans receivable     9,020.00      2,648.00     1,887.00         --

    Total Assets       480,751.01    693,316.73   751,496.53    758,682.97

    Less:

10. Mortgage/loans      54,431.73     41,777.67    31,583.24     30,958.25
11. Accum. deprec.     127,839.00    140,944.00   127,876.00    141,951.00
12. Shareholder's loans     --            --           --          113.00

    Total liabilities  182,270.73    182,721.67   159,459.24    173,022.25

    Net worth          298,480.28    510,595.06   592,037.29    585,660.72

    Less:

    Net worth/prior yr.              298,480.28   510,595.06    592,037.29
     Net worth inc./(-)decr.         212,114.78    81,442,23     -6,376.57

13. Nondeductible                     37,170.38    53,440.61     63,489.86
      personal expenditures

14. Nonincome adjustments                241.90    22,656.45        372.00

    Subtotals                        249,043.26   112,226.39     56,741.29

    Less:

15. Exemptions                         4,000.00     4,160.09      4,320.00
```

16. Corrected taxable income     245,043.26  108,066.39    52,421.29

   Less:

17. Taxable income reported     139,838.00   37,852.00    21,217.00

18. Additional taxable income   105,205.26   70,214.39    31,204.29